**CT Corporation**

**Service of Process Transmittal**
08/04/2021
CT Log Number 540023117

TO:     Jenny Mccarley
        Monitronics International, Inc.
        1990 Wittington Place
        Farmers Branch, TX 75234

RE:     **Process Served in Missouri**

FOR:    MONITRONICS INTERNATIONAL, INC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ARLIE TUCKER, individually and on behalf of all others similarly situated, PLTF. vs. SECURITY SYSTEMS, INC., ET AL., DFTS. // TO: MONITRONICS INTERNATIONAL, INC. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified Case # 21SLCC03384 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Clayton, MO |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/04/2021 at 14:54 |
| **JURISDICTION SERVED :** | Missouri |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/04/2021, Expected Purge Date: 08/09/2021 |
| | Image SOP |
| | Email Notification,  Daisy Xiao  xuxiao@brinkshome.com |
| | Email Notification,  Peggy Carlson  pcarlson@brinkshome.com |
| | Email Notification,  Jenny Mccarley  jmccarley@mymoni.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System 120 South Central Avenue Clayton, MO 63105 866-665-5799 SouthTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

**Exhibit A**

 Wolters Kluwer

## PROCESS SERVER DELIVERY DETAILS

**Date:**                              Wed, Aug 4, 2021

**Server Name:**                       Harry Yiatras

Entity Served                          MONITRONICS INTERNATIONAL, INC.

Case Number                            21SL-CC03384

Jurisdiction                           MO

**Exhibit A**



**IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI**

| Judge or Division:<br>VIRGINIA W LAY | Case Number: 21SL-CC03384 |
|---|---|
| Plaintiff/Petitioner:<br>ARLIE TUCKER | Plaintiff's/Petitioner's Attorney/Address<br>TIFFANY MARKO YIATRAS<br>CONSUMER PROTECTION LEGAL, LLC<br>308 HUTCHINSON ROAD<br>ELLISVILLE, MO 630112029 |
| **vs.** | |
| Defendant/Respondent:<br>SECURITY SYSTEMS, INC. | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO 63105 |
| Nature of Suit:<br>CC Declaratory Judgment | |

(Date File Stamp)

## Summons in Civil Case

The State of Missouri to: MONITRONICS INTERNATIONAL, INC.

**Alias:**

C/O CT CORPORATION SYSTEM
120 SOUTH CENTRAL AVE
CLAYTON, MO 63105

*COURT SEAL OF*



*ST. LOUIS COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.

<u>29-JUL-2021</u>
Date

_____ Clerk

Further Information:
AW

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____        _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____        _____
                                          Date                                        Notary Public

**Exhibit A**

**Sheriff's Fees, if applicable**

| | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $_____10.00_____ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**Exhibit A**

## THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

OSCA (7-99) SM30 (SMCC) *For Court Use Only:* Document ID# 21-SMCC-6549     3     (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**Exhibit A**

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

OSCA (7-99) SM30 (SMCC) *For Court Use Only.* **Document ID# 21-SMCC-6549**    4    (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**Exhibit A**

# County Satellite Court Now Open in St. Ann
### Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.    FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**

If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**

If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**

Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

### For more information call: 314-615-8029



**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

**21SL-CC03384**

**IN THE CIRCUIT COURT
OF ST. LOUIS COUNTY, MISSOURI**

ARLIE TUCKER, individually and on
behalf of all others similarly situated,

                    Plaintiff,

vs.

SECURITY SYSTEMS, INC., SAFE
HOME SECURITY, INC., ALARM
SERVICES LLC; MONITRONICS
INTERNATIONAL, INC.; and THE
BRINK'S COMPANY

                    Defendant.

Case No.
Division No.

**JURY TRIAL DEMANDED**

**CLASS ACTION PETITION**

COMES NOW, Plaintiff, ARLIE TUCKER ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through undersigned counsel, upon personal knowledge of the facts pertaining to him and on information and belief based upon the investigation of counsel as to all other matters, and brings this class action complaint against SECURITY SYSTEMS, INC., SAFE HOME SECURITY, INC., ALARM SERVICES LLC; MONITRONICS INTERNATIONAL, INC.; and THE BRINK'S COMPANY (collectively, "Defendants") as follows:

**NATURE OF CASE**

1.    This case is about Defendants' practices of using unfair, deceptive, unethical, unlawful, and/or misleading business practices to trap individuals into several year contracts for home security services.

2.    Plaintiff entered into a contract with Alliance Security Systems, Inc. who sold the contract multiple times to third party entities, each charging Plaintiff and the Class for security monitoring services.  Plaintiff and Class Members were left in a situation where it was virtually or

1

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

literally impossible to cancel their security services without incurring exorbitant fees and/or having their debt reported to credit reporting agencies.

3.    Defendant Security Systems, Inc. and Safe Home Security, Inc. enroll individuals without their consent into a security monitoring service for an indefinite amount of time and without disclosing how one can get out of the program. Once enrolled (whether consensual or non-consensual), Plaintiff is unable to get out of the contract without incurring a penalty and/or having the purported debt reported to the credit reporting agencies.  Defendants continue to send statements with account balances, previous balances, late fees, etc. and, later, threatening letters that Plaintiff will be reported to the credit bureaus every month and/or will make automatic withdraws from class members' bank account.

4.    To the extent that Safe Home Security, Inc. and Security Systems, Inc. was authorized by Court order to take over Plaintiff's security monitor account, Brink's Home Security, the security monitoring company Plaintiff had been involved with for years, knew this and failed to notify Plaintiff and the Class of the Court Order it was fully aware of and instead lead Plaintiff and the Class to believe that nothing had changed, which resulted in Plaintiff and the Class continuing to make payments and/or extending their contract with Brink's Home Security. Had Plaintiff known that it would be in two contracts at the same time, Plaintiff would not have continued to make payments and/or would not have extended the contract with Brink's Home Security.

5.    To the extent that Safe Home Security, Inc. and Security Systems, Inc. were not authorized to take over Plaintiff's security monitoring system by Court order or other third party agreement, Safe Home Security, Inc. and Security Systems, Inc. unfairly, fraudulently, and deceptively sent correspondence to Plaintiff to lead Plaintiff to believe that payments must be made

2

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

to Safe Home Security, Inc. and Security Systems, Inc.  or Plaintiff will be reported to the credit agencies for failure to pay the invoices.

6.      These willful omissions, misrepresentations, and/or unlawful and/or unethical acts and/or failures to act are likely to cause confusion and do, in fact, cause confusion, often leaving customers unwittingly bound to multi-year contracts with these entities and/or with their credit scores tarnished.

7.      Even for customers that learn the true nature of Defendants' scams, it is often too little, too late. By ensuring their contracts are next to impossible to cancel and/or, with respect to Brinks, requiring up-front payment of not less than 80% of the remainder of the contract to cancel, Defendants have successfully trapped customers in multi-year contracts worth thousands of dollars.

## PARTIES & JURISDICTION

8.      Plaintiff ARLIE TUCKER ("Plaintiff" or "Tucker") is a citizen of the State of Missouri.

9.      Defendant, SECURITY SYSTEMS, INC. is a Connecticut Corporation with its principal place of business in Connective at 1125 Middle Street, Middlestown, CT 06547. Security Systems, Inc. claims to provide administration, servicing, and billing of security system accounts. Security Systems, Inc. was established in 2001 and claims to be the nation's 16th largest security company. Defendant Security Systems, Inc. can be served through its registered agent at Incorp Services Inc., which is located at 6 Landmark Square, 4th Floor, Stamford, CT, 06901.

10.     Defendant, SAFE HOME SECURITY, INC., ("Defendant" and/or "Safe Home"), is a Connecticut corporation with its principal place of business located at 1125 Middle Street #201, Middletown, Connecticut 06457. Safe Home was incorporated in 1988. Safe Home's

3

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

registered agent for service of process in Connecticut is Incorp Services, Inc. 6 Landmark Square, 4th Floor, Stamford, CT 06901. SAFE HOME SECUIRTY, INC. is a corporation that sells, installs, services, and monitors home alarm and security systems in Missouri and other states.

11.    Defendant MONITRONICS INTERNATIONAL, INC. ("Defendant" or "Monitronics" or "Moni"), a Delaware corporation with a principal place of business at 1900 Wittington Place in Farmers Branch, Texas 75234 provides residential customers and commercial client accounts with monitored home and business security systems, among other things. MONITRONICS INTERNATIONAL, INC. 2018 Annual 10K. Monitronics can be served through its registered agent at CT Corporation System located 120 South Central Ave, Clayton, Missouri, 63105.

12.    THE BRINK'S COMPANY ("Defendant" or "Brinks") is a Virginia corporation with a principal place of business located at 1801 Bayberry Court, Richmond, Virginia 23226-8100.

13.    In or about February 2018, MONITRONICS INTERNATIONAL, INC. and BRINKS, INC. (d/b/a and collectively referred to as "Brinks Home Security") entered into a long-term licensing agreement. According to the press release: "Under the terms of the agreement, MONI will have exclusive use of the BRINKS and BRINKS Home Security trademarks related to the residential smart home and home security categories in the U.S and Canada. MONI will pay Brink's customary licensing fees and minimum and growth-based royalties that will increase overtime as the BRINKS Home Security brand is reintroduced. MONI expects to pay first-year royalties of approximately $5 million. The agreement provides for an initial term of seven years and, subject to certain conditions, allows for subsequent renewal periods whereby MONI can extend the agreement beyond 20 years. The rollout of the BRINKS Home Security brand is

4

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

expected to be complete in the second quarter of 2018."

14.     Defendant ALARM SERVICES ALARM ("Defendant" or "Alarm Services") is a Connecticut corporation with its principal place of business in Rhode Island. Alarm Services claims to provide sales and marketing of residential alarm systems. Defendant Alarm Services can be served at 2404 Victory Hwy Coventry RI 02816.

15.     This Court has personal jurisdiction over Defendants because Defendants conduct business throughout the state of Missouri.

**FACTUAL BACKGROUND**

**ALLIANCE**

16.     Alliance Security, Inc. offers (a) alarm system installation and a monitoring contract (the Customers agree to sign a three (3) to five (5) year Alarm Monitoring Agreement ("AMA") with Alliance) as well as (b) a sale and installation agreement for the purchase of certain alarm monitoring equipment.

17.     With respect to its alarm monitoring accounts, following an alarm installation Alliance may, and typically does, sell the alarm monitoring account to a third-party alarm services company, including Defendants or Defendant's agents, in exchange for upfront payment of the certain percentage of the future monthly monitoring fees.

**ALLIANCE AND MONITRONICS – THE RELATIONSHIP**

18.     Alliance and Monitronics International, Inc. ("Monitronics") were parties to an Alarm Monitoring Purchase Agreement (the "AMPA"), which, *inter alia*, provided a mechanism by which Monitronics could purchase, under various conditions and within Monitronics' discretion as defined in the AMPA and the addendums thereto, any alarm monitoring agreement that Alliance entered into with a security system customer and desires to sell.

5

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

19. The AMPA included a right of first refusal, whereby Monitronics had a right of first refusal with respect to the purchase of Alliance's alarm monitoring agreements.

20. In addition to the AMPA, the Debtor and a division of Monitronics executed that certain Contract Monitoring Agreement (the "CMA") dated April 22, 2008 and as amended from time. The CMA details the agreement between the parties engaging Monitronics to monitor alarm systems installed by the Debtor. The Debtor does not have the ability to monitor alarm systems and relies on Monitronics and others for this service.

21. Said differently, prior to selling an alarm monitoring agreement to Monitronics pursuant to the AMPA, Monitronics Security LP handled the alarm monitoring for Alliance's customers pursuant to a Master Contract Monitoring Agreement dated April 22, 2008, and as thereafter amended on July 16, 2010 and May 15, 2012 (the "CMA").

22. From 2007 through 2017, Alliance and Monitronics International, Inc. ("Monitronics") were parties to an Alarm Monitoring Purchase Agreement (the "AMPA"), in which, *inter alia*, Monitronics could purchase Alliance's AMAs, under various conditions and within Monitronics' discretion as defined in the AMPA and the addendums thereto.

23. Customers pay the initial month of monitoring fees to Alliance (Alliance does not provide monitoring directly, but pays Monitronics or other providers for monitoring).

24. Customers are evaluated for creditworthiness by Alliance along with other factors, including ACH use and the term of the AMA, resulting in a total AMA value.

25. AMAs are bundled and transmitted to Monitronics typically three (3) times each week, at which time Monitronics conducts additional underwriting and determines whether to purchase each AMA.

26. AMAs not purchased are returned to Alliance, which pursuant to the AMPA, are to

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

remain the property of the Alliance unless and until Monitronics agrees to release its lien as to certain accounts. The AMAs not purchased are still a part of Monitronics' collateral.

27.    If Monitronics agreed to purchase an AMA, Monitronics would pay the agreed upon purchase price formula less a "holdback" percentage. The holdback amount is intended to protect Monitronics in the event the customer defaults on the AMA or is otherwise returned to the Alliance pursuant to the AMPA within the first year.

28.    Payments were made by Monitronics to the Alliance typically three (3) times each week for the AMAs purchased.

29.    Monitronics sends the customer a notice of assignment and thereafter collects the monthly monitoring fee. In the event the customer defaults or is otherwise returned to the Alliance in the first year, Monitronics debits the holdback account balance accordingly.

30.    The AMPA provided that the Debtor may not sell an AMA to a third party without Monitronics' consent.

## MONITRONICS AND THE BRINKS COMPANY - THE RELATIONSHIP

31.    On February 26, 2018, Monitronics entered into an exclusive, long-term, trademark licensing agreement with The Brink's Company ("Brink's"), which resulted in a complete rebranding of Monitronics and its subsidiary as Brink's Home Security (the "Brink's License Agreement").

32.    Pursuant to the terms of the Brink's License Agreement, Monitronics has exclusive use of the Brinks and Brinks Home Security trademarks related to the residential smart home and home security categories in the U.S. and Canada. The Brink's License Agreement provides for an initial term of seven years and, subject to certain conditions, allows for subsequent renewal periods whereby Monitronics can extend the agreement beyond 20 years.

7

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

33.    The rollout of the Brink's Home Security brand in the second quarter of 2018 included the integration of Monitronics' and Brinks' business models under a single brand – Brinks Home Security.

34.    In May 2018, both the Dealer Channel and Direct to Consumer Channels began to go to market under the Brinks Home Security brand.

35.    In June 2018, the Brink's Home Security brand was marketed directly to consumers.

36.    Monitronics and Brinks (collectively referred to as "Brinks Home Security") generates nearly all of their revenue from fees charged to customers (or "subscribers") under alarm monitoring agreements ("AMAs"), which include access to interactive and automation features at a higher fee. Each new AMA is generally generated at a cost based on a multiple of the account's RMR. The dealer contracts generally provide that if an acquired AMA is terminated within the first 12 months, the dealer must replace the AMA or refund the AMA purchase price. To secure the dealer's obligation, Brinks Home Security typically retains a percentage of the AMA purchase price.

37.    Approximately 94% of our subscribers are residential homeowners.

38.    Brinks Home Security represents in its 10K that:

"AMAs typically contain provisions automatically renewing the term of the contract at the end of the initial term, unless a cancellation notice is delivered in accordance with the terms of the contract. **If the customer cancels prior to the end of the contract term, other than in accordance with the contract, we may charge the customer an early cancellation fee as specified in the contract, which typically allows us to charge 80% of the amounts that would have been paid over the remaining term of the contract.** Several states have adopted, or are considering the adoption of, consumer protection policies or legal precedents which purport to void or substantially limit the automatic renewal provisions of contracts such as the AMAs, or otherwise restrict the charges that can be imposed upon contract cancellation. Such initiatives could negatively impact our business. Adverse judicial determinations regarding these matters could increase legal

8

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

exposure to customers against whom such charges have been imposed, and the risk that certain customers may seek to recover such charges through litigation. In addition, the costs of defending such litigation and enforcement actions could have an adverse effect on our business and operations."

(Emphasis added.) (hereinafter referred to "Penalty Clause")

## ALARM SERVICES

39.     Upon information and belief, pursuant to Alarm Services LLC's agreement with Alliance Security Systems, Inc., Alarm Services began sending Invoices to Plaintiff beginning on or about July 2017. Plaintiff continued to be billed through November 2018 in the amount of or about $59.99. Of note, Plaintiff was already receiving home security services from Brinks and/or Monitronics and, therefore, Alarm Services could not have been providing the service it was charging Plaintiff for.

40.     Unbeknownst to Plaintiff, upon information and belief, these bills were paid automatically via automatic withdraw that had previously been provided to Alliance Security Systems, Inc.

## SAFE HOME SECURITY AND SECURITY SYSTEMS, INC.

41.     SAFE HOME SECURITY, INC. and SECURITY SYSTEMS, INC. are corporations that jointly sell, install, service, and monitor home alarm and security systems in Missouri and other states.

42.     The Connecticut Office of Attorney General and the Connecticut Department of Consumer Protection has received numerous complaints from consumers claiming that Safe Home Security engages in various abusive and predatory business practices, including making misrepresentations that unfairly lock them into long-term contracts and made it difficult for them to cancel. In fact, ADT is currently litigating claims against Safe Home Security for tortious interference with a third party and for poaching its customers. *See, ADT LLC v. Safe Home*

9

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

*Security, Inc.*, 1:20-cv-23918.

43.    Upon information and belief, complaints show that Safe Home Security sales agents many times intentionally target customers that are over the age of 65, are infirm, or have diminished mental capacities. Plaintiff in the instant action is more than 70 years old.

### ALLIANCE AND SAFE HOME SECURITY / THE BREAKDOWN OF ALLIANCE AND MONITRONIC'S RELATIONSHIP

44.    At some point, without the consent of Monitronics, Alliance sold approximately $1,500,000.00 of contracts to third party Safe Home Security, Inc.

45.    Upon information and belief, Plaintiff's name (or the name on the account) did not appear on the Bill of Sale identifying the individuals' and/or businesses' accounts being sold to Safe Home Security, Inc.

46.    Additionally, from 2015 through 2017, Alliance would periodically sell AMAs that Monitronics chose not to purchase to Buyer in bulk. Notably, Alliance sold substantially all of its existing AMAs to Safe Home Security just prior to Alliance's Bankruptcy filing for approximately $1,500,000.[1]

47.    At some point after entering into the AMPA and CMA agreements with Monitronics, Alliance rejected the AMPA and subsequently entered into a Dealer Agreement with Safe Home Security, Inc. ("SHS") pursuant to a Court Order Authorizing Alliance to Enter Into Dealer Agreement (Doc. No. 337) entered by the Bankruptcy Court on December 11, 2017. Alliance also rejected the CMA effective December 28, 2017, pursuant to the Agreed Order Authorizing Debtor's Rejection of Contract Monitoring Agreement pursuant to 11 U.S.C §§ 365

---

[1]Alliance's position is that it was authorized to sell these AMAs to SHS under the AMPA, as these AMAs were previously rejected by Monitronics, or did not meet Monitronic's AMA purchase requirements. However, Monitronics disputes that Alliance was authorized to do so.

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

and Fed. R. Bankr. P. 6006 entered by the Bankruptcy Court on December 4, 2017 (Doc. No. 330).

48.     In or about February 2019, subject to Court approval, Alliance additionally negotiated and entered into an Asset Purchase and Sale Agreement ("APA") with Security Systems, Inc. ("Buyer") whereby Safe Home Security proposed to acquire substantially all of the Assets of the Alliance, except those assets specially excluded in the APA (the "Assets).

49.     The Court, in May 2019, approved the sale and the Assets were, per the Order, authorized sold free and clear of all liens, liabilities, security interests, claims, encumbrances and interests.

50.     Alliance sold the Assets.

51.     Alliance further represented to the Court on February 23, 2019 that "Prior to selling any accounts to SHS, the alarm monitoring services are now provided by SHS or Rapid Response Monitoring, Inc."

52.     Furthermore, Alliance moved the Court requesting approval of Alliance's assumption and assignment of certain executory contracts and unexpired leases to Security Systems, Inc. Alliance further requested that the Order approving the sale  provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of the Successful Bidder notwithstanding any provisions in the Assigned Contracts, including those described in 11 U.S.C. §§ 365(b)(2) and (f)(1) and (3), that purport to prohibit assignments.  Upon information and belief, that Court granted the relief requested.

53.     Safe Home Security / Security Systems, Inc. began billing Plaintiff in or about January 2019 and has continued to do so for not just one, but two accounts.  One account is billed in the amount of approximately $24.99 a month as well as additional late fees and processing fees. A second account is assessed $59.99 a month along with processing fees, late fees, and finance

11

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

charges.

### UNFAIR, UNLAWFUL, UNETHICAL, CONFUSION, AND/OR DECEPTIVE TRADE PRACTICES SECURITY SYSTEMS, INC./SAFE HOME SECURITY, INC. AND BY BRINKS HOME SECURITY / MONITRONICS

54.    Through no act of the consumer, including Plaintiff, Safe Home Security sends correspondence from Security Systems, Inc. and Safe Home Security representing that:

> "We are pleased to announce that Security Systems, Inc. will now be your security provider.  Security Systems, Inc. will now be responsible for the administration, servicing, and billing of your account.  Your existing company may still be involved in servicing your security system.  Your protection will continue uninterrupted in accordance with the terms of your existing monitoring agreement.  Your central station will not charge, nor will your 24-hour monitored protection be impacted in any way."

55.    After sending the Notification Letter, Safe Home Security immediately begins to issue Plaintiff billing statements on a monthly basis. This happened to Plaintiff.

56.    Once a customer becomes enrolled in this program, the customer cannot get out.

57.    When a customer tries to cancel the program, Safe Home Security does not effect the cancellation. This happened to Plaintiff.

58.    If a customer does not make payment on the account, the statements not only include charges for the account balance, but also previous balance, processing fees, late fees, and finance charges.

59.    At some point, Safe Home Security starts to send threatening letters for a purported debt owed by the consumer who does not pay the invoice for services they did not agree to enroll in.  In the threatening letter, Safe Home Security represents that: "[a]ll accounts are reported to multiple credit bureaus monthly." To "avoid future delinquent reporting as well as additional late and finance charges," Safe Home Security advised Plaintiff to "please remit payment immediately."  This happened to Plaintiff.

12

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

60.    Additionally, to the extent that Safe Home Security, Inc. and Security Systems, Inc. were authorized by Court order to take over Plaintiff's security monitor account as part of the Bill of Sale, Brinks Home Security knew this and failed to notify Plaintiff and the Class of the Court Order and instead led Plaintiff and the Class to believe that nothing had changed, which resulted in Plaintiff and the Class continuing to make payments and/or extending their contract with Brinks Home Security.  Had Plaintiff known that it would be in two contracts at the same time, Plaintiff would not have continued to make payments and/or would not have extended the contract with Brinks Home Security.

61.    These willful omissions, misrepresentations, and/or unlawful and/or unethical acts and failures to act are likely to cause confusion and do, in fact, cause confusion, often leaving customers unwittingly bound to multi-year contracts with these entities and/or their credit scores tarnished.

62.    Even for customers that learn the true nature of Defendants' scam, it is often too little, too late. By ensuring their contracts are next to impossible to cancel, Defendants have successfully trapped customers in multi-year contracts worth thousands of dollars.

63.    Brinks Home Security and/or Monitronics also continues to bill Plaintiff despite the change in relationship between Alliance and Brinks / Monitronics and also extends consumers' contracts without their express informed consent. Based on representations made by Brinks/Monitronics and the failure to disclose material information that Brinks was purportedly not the rightful security monitoring service provider under the contract, Plaintiff was wrongfully lead to believe that payments for security services should be made to Brinks Home Security.  Of importance, Brinks Home Security's 10K, Defendant Brinks Home Security essentially discloses that its agreements typically contain what is known as a "penalty clause".  Thus, Plaintiff is locked

13

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

into the Brink's Home Security contract and would have to pay 80% of the remainder of the contract in order to get out of it.

64.    Brinks additionally may have induced Plaintiff into extended the contract for 36 months without fully disclosing the situation described herein and misrepresenting that there was a contract with Brinks to be renewed – despite Brinks being fully aware of the material facts and knowing that its representations were untrue.

### PLAINTIFF'S EXPERIENCE

65.    On October 30, 2014, Plaintiff entered into an AMA with Alliance Security, Inc. (Alliance) to provide a home security system and related services.  Plaintiff paid Alliance for the services in the amount of $59.99 in November 2014.  *See*, **Exhibit A** for a copy of said Contract (containing redactions to protect personally identifiable information ("PII") and other sensitive information).

66.    In or about January 2015, pursuant to one or more of Monitronics' agreements with Alliance, namely the AMPA and/or the CMA, Plaintiff began receiving Plaintiff's security monitoring services from Monitronics International, Inc. Plaintiff began making payments to Monitronics for those services.  Monitronics provided home security services to Plaintiff and Plaintiff paid for those services from on or about January 2015 to on or about May 2018.

67.    From January 2015 to approximately November 2017, Plaintiff continued to pay Alliance in the amount of $5.00 per month.

68.    From June 2018 to present, pursuant to the licensing agreement between Monitronics International, Inc. and The Brinks Company, Brinks Home Security has been providing Plaintiff with monitoring services and Plaintiff has paid Brinks Home Security for the service. Plaintiff has been paying Brinks Home Security for the services.  When Plaintiff requested

14

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

a copy of their contract with Brinks, Brinks emailed an Alliance Security, Inc. contract. *See* **Exhibit A** (containing redactions to protect personally identifiable information ("PII") and other sensitive information).

69.    On or about June 2018, Plaintiff received an Auto Pay Notification from Brinks Home Security that stated:

> "We were unable to process your recurring AutoPay payment through your financial institution. All future attempts to draft your account have been stopped until we received updated payment information from you. To avoid an interruption in your monitoring service please pay your balance of $63.23 immediately."

70.    Consistent with the rollout of the Brink's Home Security brand, on or about July 3, 2018, Plaintiff received a Statement from Brinks indicating that $63.23 was overdue, despite having paid a company on June 18, 2018 for monitoring services.

71.    Plaintiff brought Plaintiff's Brinks account current on or about October 2018.

72.    Plaintiff continues to receive Brinks Home Security Statements and continues to make payments for the security system.

73.    Meanwhile, from July 2017 to approximately November 2018, Alarm Services LLC began billing and automatically withdrawing from Plaintiff's account approximately $59.99 a month.

74.    Beginning on or about January 2019, Plaintiff also began receiving invoices from Safe Home Security, Inc. and Security Systems Inc. for **two** security monitoring accounts (despite only having agreed to on system with Alliance Security Systems, Inc. in the past) without enrolling into a program with Safe Home Security and Security Systems Inc.

75.    At some point after October 23, 2018 (because the document sent contains a stamp at the bottom that indicates the date on which the form document was revised, so it could not have been before that date), Plaintiff received correspondence from Security Systems, Inc. and Safe

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

Home Security representing that:

> "**We are pleased to announce that Security Systems, Inc. will now be your security provider.  Security Systems, Inc. will now be responsible for the administration, servicing, and billing of your account.**  Your existing company may still be involved in servicing your security system.  **Your protection will continue** uninterrupted **in accordance with the terms of your existing monitoring agreement.**  Your central station will not change, nor will your 24-hour monitored protection be impacted in any way."

(emphasis added).

76.     However, Plaintiff did not sign up for security monitoring with Safe Home Security as Plaintiff was already paying for security monitoring through another company, Brinks Home Security.  Thus, these representations were false, as Plaintiff continued to receive invoices and service and administration, servicing, and billing of his account through Brinks Home Security, who Plaintiff had an existing monitoring agreement.

77.     On or about January 2019, Safe Home Security began issuing Plaintiff billing statements. Plaintiff continues to receive billing statements from Safe Home Security and Security Systems Inc. for Customer ID 578553 and 578554.  The statements include charges for the account balance, previous balance, processing fees, late fees, and finance charges.

78.     Plaintiff contacted Safe Home Security about the invoice and to notify them there must be a misunderstanding as Plaintiff did not sign up for an account with Safe Home Security and Security Systems Inc. and asked Safe Home Security to stop sending bills and to cancel the alleged services and bills.

79.     To date, Safe Home Security and Security Systems Inc. have not canceled the alleged services and has not stopped sending bills – reflecting, among other things, late fees and cost recovery fees.

80.     Plaintiff, at some point, received "Central Station Subscriber Verification Forms".

16

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

The were purported to be printed on May 1, 2018, however, as indicated, this company had not sent its initial enrollment form until sometime after October 23, 2018. The form asked Plaintiff to fill out information and sign the document which stated: "ACKNOWLEDGE THAT ALL THE INFORMATION REGARDING MY ACCOUNT IS CORRECT AND UNDERSTAND THAT THIS IS THE ONLY INFORMATION AVAILABLE TO YOU."

81.     Plaintiff did not sign or return either of the forms as nothing in the forms were correct. Plaintiff did not have an account with Safe Home Security and Plaintiff understood that Plaintiff's only accounts were with Brinks Home Security.

82.     Additionally, on May 1, 2019, Safe Home Security resorted to sending threatening letters for a purported debt owed by Plaintiff. Specifically, Plaintiff received a letter from Safe Home Security for a past due amount in connection with Customer ID 578553. Safe Home Security notified Plaintiff that "[a]ll accounts are reported to multiple credit bureaus monthly." To "avoid future delinquent reporting as well as additional late and finance charges," Safe Home Security advised Plaintiff to "please remit payment immediately."

83.     Additionally, on May 3, 2019, Plaintiff even received a letter from Safe Home Security for a past due amount in connection with Customer ID 578554. Safe Home Security notified Plaintiff that "[a]ll accounts are reported to multiple credit bureaus monthly." To "avoid future delinquent reporting as well as additional late and finance charges," Safe Home Security advised Plaintiff to "please remit payment immediately."

84.     It is Plaintiff's understanding that Safe Home Security has never provided actual security monitoring service to Plaintiff, as, during all relevant times, any time an alarm has gone off, Brinks Home Security is the company who has contacted Plaintiff. Safe Home Security has, to Plaintiff's understanding, never contacted Plaintiff.

17

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

## EACH DEFENDANT'S DECEPTIVE CONDUCT IS KNOWING AND INTENTIONAL

85.    Such practices violate statutory and common-law prohibitions against the use of deceptive, misleading, unlawful, or unethical business practices in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires, among other things, that Members shall prohibit their Representatives from engaging in deceptive, misleading, unlawful, or unethical business practices. *See*, https://esaweb.org/wp-content/uploads/2019/05/Code_of_Ethics.pdf for the Code of Ethics and Standards of Conduct for the standards and code.

86.    Each of the Defendants knows these types of sales practices are contrary to the law and established industry standards, yet knowingly continues such conduct. None of the Defendants have taken appropriate action to curb such conduct by their respective sales agents and/or account administrators.

87.    Each Defendant's conduct is knowing and intentional. At best, each Defendant is aware of such conduct by its sales agents and/or account administrators but does not take sufficient actions to stop them despite having the ability to do so. At worst, each Defendant knowingly teaches and condones these actions by its agents.    Each Defendant refuses to cancel the subscription despite knowing it used unfair, unlawful, deceptive, and otherwise wrongful business practices to enroll Plaintiff and the class in the subscription and/or renew/extend a no longer valid subscription.

88.    Defendants' conduct has not stopped, and will not stop, because each Defendant generates significant profits from its deceptive tactics. Every alarm account the Defendant acquires through deceptive sales conduct creates a new revenue stream for that Defendant, potentially for several years beyond the initial term of the new contract. Thus, the Defendants deceptive practices

18

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

are designed to obtain as many accounts as possible through whatever means possible. On information and belief, such conduct has permitted each Defendant to bolster their financial reports and receive new credit and/or equity investments that otherwise might not be possible without the illegal sales conduct.

### CLASS ACTION ALLEGATIONS

89.    This action may be brought and properly maintained as a class action pursuant to the provisions of Rule 52.08 of the Missouri Rules of Civil Procedure and/or the Missouri Merchandising Practices Act, 407.025, individually and on behalf of the following classes:

> **All individual citizens of the State of Missouri who have been enrolled in Brink's or Monitronic's security monitoring system or had their Brink's or Monitronic's security monitoring system extended without their express informed consent. ("Brinks Unlawful Enrollment/Extension Class")**

> **All individual citizens of the State of Missouri who have been enrolled in Safe Home Security or Security Systems, Inc.'s security monitoring system without their express informed consent. ("Safe Home Security/Security Systems Inc.'s Unlawful Enrollment Class").**

> **All individual citizens of the State of Missouri who have been enrolled in Alarm Services LLC's security monitoring system without their express informed consent. ("Alarm Services LLC's Unlawful Enrollment Class")**

> **All individual citizens of the State of Missouri who are unable to cancel Brink's or Monitronic's security monitoring program without incurring a cancellation fee. ("Unfair Penalty Class")**

> **All individual citizens of the State of Missouri who are unable to cancel the Safe Home Security, Inc. security monitoring program. ("Unable to Cancel Class").**

> **All individual citizens of the State of Missouri who have been billed and charged by Alarm Services LLC but not actually received home security services from Alarm Services LLC. ("Alarm Services")**

Excluded from the Classes are (1) Defendants, Defendants' agents, subsidiaries, parents,

19

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

successors, predecessors, and any entity in which Defendants or Defendants' parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) Any governmental entities and any instrumentalities, subdivisions, agencies thereof; (4) any person who executes and files a timely request for exclusion from the Class; (5) any person who has had their claims in this matter finally adjudicated and/or otherwise released; (6) the legal representatives, successors and assigns of any such excluded person; (7) counsel of record.

90.    **Numerosity**. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Defendants' records. Defendants have the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to plaintiff.

91.    It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

92.    **Commonality and Predominance**. There are questions of law and fact common to the Classes which predominate over any individual issues. Among the questions of law and fact common to the Classes are, without limitation:

20

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

a.      Whether Brinks Home Security or Monitronics has a uniform practice of enrolling or extending consumers' security monitoring program services without first obtaining express affirmative informed consent;

b.      Whether Alarm Services LLC has a uniform practice of enrolling or extending consumers' security monitoring program services without first obtaining express affirmative informed consent;

c.      Whether Alarm Services LLC has a uniform practice of billing and/or automatically withdrawing funds from Plaintiff's bank account without Plaintiff's informed consent;

d.      Whether Safe Home Security / Security Systems, Inc. has a uniform practice of enrolling or extending consumers' security monitoring program services without first obtaining express affirmative informed consent;

e.      Whether Brinks Home Security or Monitronics has a uniform practice of not allowing Plaintiff or the class to cancel the home security system without incurring a penalty;

f.      Whether Safe Home Security / Security Systems, Inc. has a uniform practice of making it impossible to cancel the home security system account;

g.      Whether Alarm Services LLC has a uniform practice of billing and charging Plaintiff and the class's accounts and not actually providing the services for which it claimed to provide;

h.      Whether Defendants owed a duty to the class members under the applicable statutes and/or common law;

i.      Whether each Defendant made a material omission about the home security program;

j.      Whether each Defendant violated the Missouri Merchandising Practices Act,

21

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

407.010, *et seq.* by the practices described herein;

      k.      Whether Plaintiff is entitled to declaratory judgment;

      l.      Whether Plaintiff and the respective class members are entitled to an injunction prohibiting Defendants from engaging in deceptive trade practices as described herein and breaching its duty to Plaintiff and respective class;

      m.      Whether Plaintiff and the respective class members are entitled to damages;

      n.      Whether Plaintiff and the respective class are entitled to attorneys' fees; and/or

      o.      Whether Plaintiff and the respective class are entitled to costs.

      93.    **Typicality**. Plaintiff's claims are typical of the Class. As with members of the Classes, Plaintiff was scammed the same way as the other individual class members and was part of the same scheme. Plaintiff's interests coincide with, and are not antagonistic to, those of the other class members.

      94.    **Adequacy**. Plaintiff is an adequate representative of the Classes because Plaintiff fits within the class definition and Plaintiff's interests do not conflict with the interests of the Members of the Classes Plaintiff seeks to represent. Plaintiff is knowledgeable about the subject matter of this litigation, is passionate about this litigation personally, and will vigorously prosecute this action vigorously for the benefit of the entire Class. Plaintiff is represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as class counsel. Class counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and class counsel can fairly and adequately protect the interests of all of the Members of the Class. Plaintiff and his counsel are aware of no conflicts of interests between Plaintiff and absent Class members or otherwise. Plaintiff has or can acquire adequate financial resources to assure that the interests of

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

the Classes will not be harmed.

95.    **Superiority of Class Action**.  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiff and members of the Classes have suffered irreparable harm as a result of Defendant's fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class members' claims, no Class members could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class members would have no reasonable remedy and would continue to suffer losses, as Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint, and Defendant would be permitted to retain the proceeds from their continued violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  There will be no difficulty in the management of this action as a class action.  Upon information and belief, members of the Classes can be readily identified and notified based on, inter alia, Defendant's records and databases.  Plaintiff is unaware of any difficulty likely to be encountered in the management of this case that would preclude its maintenance as a class action.

96.    **Injunctive and Declaratory Relief**. Defendant has acted, and refused to act, on grounds generally applicable to the respective class, thereby making appropriate final injunctive relief with respect to the respective classes as a whole.

**COUNTS**

**COUNT I**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

## UNJUST ENRICHMENT

### (Against Alarm Services LLC)

97.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Petition as if fully set forth herein.

98.     To the detriment of Plaintiffs and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

99.     Plaintiff and the Class conferred a benefit on Defendants when Plaintiff paid Defendants money for services that were not received and/or for services that were not contracted for.

100.     Defendants unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits which, under the circumstances, would be unjust to allow Defendant to retain.

101.     Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

### COUNT II

### DECLARATORY JUDGMENT

### AGAINST ALL DEFENDANTS

102.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Petition as if fully set forth herein.

103.     There exists between Plaintiff and each Defendant a substantial, *bona fide*, actual and justiciable dispute regarding which Defendant (if any) Plaintiff is obligated to pay for home security system services and which Defendants are not entitled to bill or charge Plaintiff for home security system services.

104.     Plaintiff is therefore entitled to have a declaration of Plaintiffs' rights and a judicial

24

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

interpretation of the rights and obligations of the parties under the Alliance Security, Inc. contract or any Court Order referenced herein.

105.    There is no adequate remedy, other than that requested herein, by which this controversy may be resolved.

106.    The question presented is "ripe for judicial determination.

## COUNT III
## THE MISSOURI MERCHANDISING PRACTICES ACT
## MO. REV. STAT. § 407.010, *ET SEQ.*

**(Plaintiff and the Missouri Class against Brinks and Monitronics)**

107.    Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

108.    Defendants as referenced in this Count are Brinks and Monitronics.

109.    The Missouri Merchandising Practice Act, MO. Rev. Stat. § 407.020, et seq. ("MMPA") outlaws unfair and deceptive acts and practices.

110.    Specifically, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020, states in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice. [...] Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

111.    Missouri regulations define "unfair practice" pursuant to the MMPA as any practice that "[o]ffends any public policy as it has been established ... by the Federal Trade Commission ... or [i]s unethical .... [and] [p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. tit. 15, § 60-8.020.

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

112.    Defendants are a "person" within the meaning of the Missouri Merchandising Practices Act, Mo. Rev. Stat 407.010(4).

113.    The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. Mo. Rev. Stat. § 407.010. Thus, the purported home security program that the Defendants advertised and/or sold to its customers is "merchandise".

114.    Defendants' actions in the "advertisement" or "sale" of a home security system are unfair in violation of the MMPA because these actions are unethical. In addition, Defendants violate public policy as it has been established by the Federal Trade Commission.

115.    In addition to Defendants' practices and/or actions being unfair, Defendant's practices and/or actions in the advertisement or sale of its services are also "misrepresentation(s)" and/or a "omission(s) of material fact(s)" in violation of the MMPA as more fully described herein.

116.    Missouri regulations provide that "[a] seller shall not make a representation or statement of fact in an advertisement that is false or has the capacity to mislead prospective purchasers." Mo. Code Regs. tit. 15, § 60-7.010(1).

117.    Missouri regulations further provide: "It is a misrepresentation for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." Mo. Code Regs. tit. 15, § 60-9.090.

118.    Missouri regulations further provide: […] (3) Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her; (4) Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1., RSMo.   Mo. Code Regs. tit. 15, § 60-9.110

26

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

119.     Specifically, Defendants, itself or by and through an agent, commit a "unfair" or otherwise unlawful practice under the MMPA by: (a) representing through its agents and/or third party entities that Plaintiff will be charged a specific amount for a home security system and service upon entering or renewing a contract and instead Plaintiff will be charged more than once; (b) failing to disclose that Plaintiff will be charged by more than one company for home security system and/or services; (c) by failing to adequately disclose that once enrolled in the home security system and program that one cannot cancel the program and/or cannot cancel the home security system and program without incurring a unlawful penalty; (d) by failing to cancel Plaintiff from the home security system even though, upon information and belief, the contract is invalid pursuant to Court order and continuing to automatically renew Plaintiff in the home security system and services each month; and/or (e) failing to disclose material facts that would cause a reasonable customer to not enter into a contract, renew a contract, or continue to pay pursuant to either; and/or (f) continuing to bill Plaintiff and/or accept Plaintiff's payments even though they are not entitled to payment due to undisclosed material facts and/or misrepresentations; and/or (g) having a policy or practice of charging a penalty in the amount of the purported remaining months on the contract upon request to cancel.

120.     Defendants' conduct was objectively unlawful under the MMPA and was likely to deceive and/or confuse reasonable consumers under the circumstances and was a material fact that a reasonable consumer would attach importance to when reviewing an advertisement or entering into a contract with a security system product and/or service provider.  This fact would influence a reasonable consumer choice of action when determining whether to sign a contract regarding security system products and/or services.

121.     Defendants have engaged in these unfair and unlawful practices as described above

27

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

willfully and knowingly.

122. Defendants' knowledge that the acts and practices enumerated above are unethical, unfair, omissions of material facts, and/or misrepresentations within the meaning of the MMPA is stated herein.

123. The MMPA provides for a civil action to recover damages in Mo. Rev. Stat. § 407.025, which states:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action … to recover actual damages.

124. The security monitoring system and services were purchased for personal, family, or household purposes.

125. These acts and omissions directly and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss.

126. Defendants continue, to this day, to engaging in the business practices which violate the MMPA.

127. Injunctive relief is necessary and proper to compel Defendants to cease its violations of the MMPA alleged herein.

WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below.

## COUNT IV
## THE MISSOURI MERCHANDISING PRACTICES ACT
## MO. REV. STAT. § 407.010, *ET SEQ.*

### (Plaintiff and the Missouri Class against Safe Home Security)

128. Plaintiff hereby incorporates by reference the preceding allegations as if fully set

28

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

forth herein.

129. Defendant as referenced in this Count is Safe Home Security.

130. The Missouri Merchandising Practice Act, MO. Rev. Stat. § 407.020, et seq. ("MMPA") outlaws unfair and deceptive acts and practices.

131. Specifically, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020, states in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice. [...] Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

132. Missouri regulations define "unfair practice" pursuant to the MMPA as any practice that "[o]ffends any public policy as it has been established ... by the Federal Trade Commission ... or [i]s unethical .... [and] [p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. tit. 15, § 60-8.020.

133. Defendant is a "person" within the meaning of the Missouri Merchandising Practices Act, Mo. Rev. Stat 407.010(4).

134. The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. Mo. Rev. Stat. § 407.010. Thus, the purported home security program that the Defendant advertised and/or sold to its customers is "merchandise".

135. Defendant's actions in the "advertisement" or "sale" of a home security system are unfair in violation of the MMPA because these actions are unethical. In addition, it violates public policy as it has been established by the Federal Trade Commission.

136. In addition to Defendant's practices and/or actions being unfair, Defendant's

29

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

practices and/or actions in the advertisement or sale of its services are also "misrepresentation(s)" and/or a "omission(s) of material fact(s)" in violation of the MMPA as more fully described herein.

137.    Missouri regulations provide that "[a] seller shall not make a representation or statement of fact in an advertisement that is false or has the capacity to mislead prospective purchasers." Mo. Code Regs. tit. 15, § 60-7.010(1).

138.    Missouri regulations further provide: "It is a misrepresentation for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." Mo. Code Regs. tit. 15, § 60-9.090.

139.    Missouri regulations further provide: […] (3) Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her; (4) Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1., RSMo.   Mo. Code Regs. tit. 15, § 60-9.110.

140.    Specifically, Defendants, itself or by and through an agent, commit a "unfair" or otherwise unlawful practice under the MMPA by: (a) representing through its agents and/or third party entities that Safe Home Security / Security Systems Inc. are entitled to take over Plaintiff's account for a home security system and continuing to bill and harass Plaintiff for payment even though they are not entitled to payment due; (b) billing plaintiff more than once for home security services each month; (c) continuing to bill Plaintiff and class members who do not return a "Subscriber Verification Form" for services; and/or (d) threatening to notify creditors for purported debt and continuing to send invoices with late fees and processing fees even though Defendant is not entitled to payment.

30

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

141.    Defendants' conduct was objectively unlawful under the MMPA and was likely to deceive and/or confuse reasonable consumers under the circumstances and was a material fact that a reasonable consumer would attach importance to when reviewing an advertisement or entering into a contract with a security system product and/or service provider.  This fact would influence a reasonable consumer choice of action when determining whether to sign a contract regarding security system products and/or services.

142.    Defendant's conduct was objectively unlawful under the MMPA and was likely to deceive and/or confuse reasonable consumers under the circumstances and was a material fact that a reasonable consumer would attach importance to when reviewing an advertisement or entering a contract with a security system product and/or service.

143.    Defendant has engaged in the unfair and unethical acts and practices as described above willfully and knowingly.

144.    Defendant's knowledge that the acts and practices enumerated above are unethical, unfair, omissions of material facts, and/or misrepresentations within the meaning of the MMPA is stated herein.

145.    The MMPA provides for a civil action to recover damages in Mo. Rev. Stat. § 407.025, which states:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action … to recover actual damages. The court may, in its discretion, award […] to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.

146.    The security monitoring system and services were purchased for personal, family, or household purposes.

31

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

147.    These acts and omissions directly and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss.

148.    Defendant continues, to this day, to engaging in the business practices which violate the MMPA.

149.    Injunctive relief is necessary and proper to compel Defendant to cease its violations of the MMPA alleged herein.

WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below.

**COUNT V**
**THE MISSOURI MERCHANDISING PRACTICES ACT**
**MO. REV. STAT. § 407.010, *ET SEQ.***

**(Plaintiff and the Missouri Class against Alarm Services LLC)**

150.    Plaintiff hereby incorporates by reference the preceding allegations as if fully set forth herein.

151.    Defendants as referenced in this Count is Alarm Services.

152.    The Missouri Merchandising Practice Act, MO. Rev. Stat. § 407.020, et seq. ("MMPA") outlaws unfair and deceptive acts and practices.

153.    Specifically, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020, states in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice. [...] Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

154.    Missouri regulations define "unfair practice" pursuant to the MMPA as any practice

32

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

that "[o]ffends any public policy as it has been established … by the Federal Trade Commission … or [i]s unethical …. [and] [p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. tit. 15, § 60-8.020.

155.    Defendant is a "person" within the meaning of the Missouri Merchandising Practices Act, Mo. Rev. Stat 407.010(4).

156.    The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. Mo. Rev. Stat. § 407.010. Thus, the purported home security program that the Defendant advertised and/or sold to its customers is "merchandise".

157.    Defendant's actions in the "advertisement" or "sale" of a home security system are unfair in violation of the MMPA because these actions are unethical. In addition, it violates public policy as it has been established by the Federal Trade Commission.

158.    In addition to Defendant's practices and/or actions being unfair, Defendant's practices and/or actions in the advertisement or sale of its services are also "misrepresentation(s)" and/or a "omission(s) of material fact(s)" in violation of the MMPA as more fully described herein.

159.    Missouri regulations provide that "[a] seller shall not make a representation or statement of fact in an advertisement that is false or has the capacity to mislead prospective purchasers." Mo. Code Regs. tit. 15, § 60-7.010(1).

160.    Missouri regulations further provide: "It is a misrepresentation for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." Mo. Code Regs. tit. 15, § 60-9.090.

161.    Missouri regulations further provide: […] (3) Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would

33

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

be known to him/her; (4) Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1., RSMo.  Mo. Code Regs. tit. 15, § 60-9.110.

162.    Specifically, Defendants, itself or by and through an agent, commit a "unfair" or otherwise unlawful practice under the MMPA by: (a) billing and/or automatically withdrawing funds from Plaintiff's bank account without Plaintiff's informed consent; (b) billing and/or automatically withdrawing funds from Plaintiff's bank account fees for services not provided.

163.    Defendants' conduct was objectively unlawful under the MMPA and was likely to deceive and/or confuse reasonable consumers under the circumstances and was a material fact that a reasonable consumer would attach importance to when reviewing an advertisement or entering into a contract with a security system product and/or service provider.  This fact would influence a reasonable consumer choice of action when determining whether to sign a contract regarding security system products and/or services.

164.    Defendant's conduct was objectively unlawful under the MMPA and was likely to deceive and/or confuse reasonable consumers under the circumstances and was a material fact that a reasonable consumer would attach importance to when reviewing an advertisement or entering a contract with a security system product and/or service.

165.    Defendant has engaged in the unfair and unethical acts and practices as described above willfully and knowingly.

166.    Defendant's knowledge that the acts and practices enumerated above are unethical, unfair, omissions of material facts, and/or misrepresentations within the meaning of the MMPA is stated herein.

167.    The MMPA provides for a civil action to recover damages in Mo. Rev. Stat. §

34

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

407.025, which states:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action ... to recover actual damages. The court may, in its discretion, award [...] to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.

168.    The security monitoring system and services were purchased for personal, family, or household purposes.

169.    These acts and omissions directly and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss.

170.    Defendant continues, to this day, to engaging in the business practices which violate the MMPA.

171.    Injunctive relief is necessary and proper to compel Defendant to cease its violations of the MMPA alleged herein.

WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, demands judgment against Defendants as follows:

A.    A determination that this action is a proper class action for compensatory, consequential, and statutory damages as alleged herein;

B.    For pre-judgment interest from the date of filing this suit;

C.    For reasonable attorney's fees and expenses;

D.    For all costs of this proceeding;

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

E.    Restitution of all fees paid to Defendants;

F.    A preliminary injunction enjoining Defendant and all others, known and unknown, from continuing to take unfair, deceptive, illegal and/or unlawful action as set forth in this Complaint; and

G.    Such other and further relief as this Honorable Court finds just and proper under the circumstances.

## JURY DEMAND

WHEREFORE, as to each of the foregoing matters, Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated: 7/28/2021                    By:    /s/  Tiffany M. Yiatras
                                    Tiffany M. Yiatras (MO Bar No. 58197)
                                    **CONSUMER PROTECTION LEGAL, LLC**
                                    308 Hutchinson Road
                                    Ellisville, Missouri 63011-2029
                                    Tele: 314-541-0317
                                    Email: tiffany@consumerprotectionlegal.com

                                    Francis J. "Casey" Flynn, Jr.
                                    **LAW OFFICE OF FRANCIS J. FLYNN, JR.**
                                    422 S. Curson Avenue
                                    Los Angeles, California 90036
                                    Email: casey@lawofficeflynn.com

                                    **ATTORNEY FOR PLAINTIFF AND THE PROPOSED CLASS**

36

**Exhibit A**

21SL-CC03384

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

# EXHIBIT A

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

# 1011 Schedule A





**AR Number:** 5015723

**Contract:** 218110

**Account:** 768115162

**Name:** TUCKER, ARLIE

**Phone:** 314-341-9812

Alarm Monitoring Agreement
Installation Agreement
QAF
New Construction Verification



Item# 1

# 1011 Schedule A

**Exhibit A**

**Alliance Security, Inc.**
60 Jefferson Park Rd
Warwick, RI 02888
(866) 493-1253
econtract@allianceci.com
License: (AL)13-1545 (AZ)Not a Licensed Contractor, (AZ)BTR 18525 (CA)ACO-7257 (CT)ELC 0180118-E1 (FL)EF20000848 (GA)LVA06093 (IA)127-001563 (MA)9699A (MD)
107-1902 (NC)1968-CSA (NC)27185-SP-FA/LV, (NJ)34BX00014000, (NV)0078299, (NY)12000312280, (OH)53.89 1723, (OK)10147S, (PA)PA040400, (RI)AFC 13590 (SC)
FAC 13513 (TN)1716 (TX)ACR-1777643 (TX)B15750.

## Alarm Monitoring Agreement

**0074**   **111**

| Owner of Home or Business | Arile | Tucker | Effective Date |
|---|---|---|---|
| Spouse/Resident | | | 10/30/2014 |
| Name of Business | | | |

| Premise Address | | | | Social Security |
|---|---|---|---|---|
| | St. Clair | MO | 63077 | Homeowner / Business Owner |
| | | | | Spouse / Resident |
| Billing Address | | | | Extended Service Option |
| | St. Clair | MO | 63077 | (Residential Customer Only) |
| | | | | $50.00 Trip Charge (See Section 16) |
| EContractID: 150066 | | | | Yes |

| Phone | | | |
|---|---|---|---|
| Home / Business Owner | (314) 341-9812 | Spouse / Resident | |

| Monthly Monitoring Service | One-time Monitoring Activation Fee | By signing below, customer acknowledges receiving appropriate terms and conditions for the cellular vendor. | | |
|---|---|---|---|---|
| Monthly Monitoring Rate $59.99 | | | | |
| Other $0.00 | $0.00 | AlarmCom | AlarmNET | Telular |
| Total Monthly Fee $59.99 | | Yes | | |
| + PLUS APPLICABLE TAX | | | | |

| Monthly Auto Payments Enrollment | | Credit Card Information | |
|---|---|---|---|
| Checking Account | | Card Number | |
| Account Number | | Expiration Date | |
| ABA Routing Number | | | |

This agreement is made by and between Alliance Security, Inc. (the "Company") and the owner of the home or business shown above (the "Customer") on the effective date indicated above. The Company agrees to provide, or cause to be provided the alarm monitoring services for the alarm system (the "System") installed at the residence or business address indicated above (the "Premises").

**1. THE SERVICE:** Upon receipt of an alarm signal from the Customer Premise, Company is responsible only for attempting to notify, as appropriate to the type of signal, the Customer, persons submitted to Company on Customer's contact list, a guard service, and/or the appropriate responding agency. For burglary signals, Company will attempt to verify that an emergency exists by calling the Customer's primary contact number and then, if necessary, the person designated for enhanced verification on the Customer's contact list. If a contracted person indicates that there is an emergency or if no contact is made with either person, Company will attempt to contact the appropriate responding agency. For non-emergency signals (i.e. low battery and trouble), Company will only attempt to contact Customer between 7:00 a.m. and 10:00 p.m. Company may choose not to respond to non-emergency signals in persons with high alarm signal traffic in the monitoring center. Company and Customer must comply with local notification and response requirements which may apply or in the future include visual verification of an emergency condition prior to response. Customer agrees to pay any charge associated with this requirement.

**2. DISCLAIMER OF WARRANTIES: NEITHER COMPANY NOR ITS CONTRACTOR REPRESENTS OR WARRANTS THAT THE SYSTEM OR THE MONITORING SERVICE WILL PREVENT ANY LOSS BY BURGLARY, FIRE, ROBBERY OR OTHERWISE, OR WILL, IN ALL CASES, PROVIDE THE SPECIFIED NOTIFICATION SERVICE.** Customer understands that there are no warranties which extend beyond the face of this Agreement and acknowledges that neither Company nor its contractor has made any representation or warranty, express or implied, including without limitation, about the condition of the System or monitoring service, their merchantability, or their fitness for any particular purpose, other than those expressly contained in this Agreement. Customer understands and acknowledges that the System, Transmission System (See Section 9), or Company's or its contractor's equipment may not function properly; that the Company or its contractor may not respond properly to the request of an alarm signal; and that neither Company nor its contractor has control over the response time or capability of any agency or person notified. CUSTOMER ALSO UNDERSTANDS THAT IN THE EVENT THAT THE COMPANY IS DETERMINED TO BE DIRECTLY OR INDIRECTLY LIABLE FOR ANY LOSS, DAMAGE, OR INJURY THAT THE $1,000 LIMIT OF LIABILITY IN SECTION 5 APPLIES.

**3. SERVICE FEES AND TERM OF AGREEMENT.** This Agreement shall continue for an initial term of three (3) years ("Initial Term") unless earlier terminated pursuant to the provisions hereof, and shall thereafter automatically renew for successive one (1) year term(s) ("Renewal Term"). Customer may cancel this Agreement by sending a signed request for cancellation to Company which includes Customer's name, address, account number, and password at least thirty (30) days before the end of the then-current term. If cancelled, this Agreement ends on the last day of the then-current term. Customer agrees to pay the Total Monthly Fee above plus all applicable taxes, permit fees, false alarm charges, communication charges, failed payment charges, guard charges, service charges, late charges, or other related charges, if applicable, whether imposed on Company or Customer. The Company may not increase the Total Monthly Fee during the Initial Term of the Initial Term of this agreement is 60 months or more, however, the Company may increase Total Monthly Fee during the Initial Term up to 5% annually without prior notice. If Customer agrees to an Initial Term of less than 60 months Company may increase Total Monthly Fee up to 5% annually during any Renewal Term without prior notice. There is a twenty five dollar ($25.00) charge on each fared payment. Customer understands that the city or county in which Customer's Premises are located may require that Customer obtain and maintain at Customer's expense a license or permit for the use and monitoring of an alarm system. If Customer fails to maintain and/or provide or update any required license or permit, Company will not be held responsible for performing the Services and may terminate the Services without notice to Customer.

| Financial Disclosure Statement | | |
|---|---|---|
| THERE IS NO FINANCE CHARGE OR COST OF CREDIT (0%) ASSOCIATED WITH THIS AGREEMENT | | |
| A. Number of Payments for the initial term is 36 | B. Amount of each payment is $59.99 (Total Monthly Free from Terms Tab) | Total of payments for the initial term is $2,159.64 (A+B) (Plus applicable levies, charges, taxes, fees, fines, and rate increases) |
| Late Charge - Company may impose a late charge of up to $5 on each payment that is more than ten (10) days past due | Pre Payment - if you prepay amounts due under this agreement there is no penalty or refund | See section 8 of this agreement for information about non payment, default and liquidated damages |

**CUSTOMER RESPONSIBILITY TO READ AGREEMENT:** CUSTOMER ACKNOWLEDGES RECEIPT OF A COMPLETE COPY OF THIS AGREEMENT AND TWO COPIES OF THE NOTICE OF CANCELLATION FORM AND HAS READ AND UNDERSTOOD ALL TERMS AND CONDITIONS INCLUDING THOSE CONTAINED ON THE REVERSE SIDE AND INCORPORATED BY REFERENCE HEREIN THESE TERMS AND CONDITIONS INCLUDE A DISCLAIMER OF WARRANTIES IN SECTION 2, A ONE THOUSAND DOLLAR ($1,000) LIMITATION OF LIABILITY IN SECTION 5, A LIST OF CUSTOMER'S DUTIES IN SECTION 6, TRANSMISSION SYSTEM IN SECTION 9, AN ARBITRATION CLAUSE IN SECTION 14, AND AN AUTHORIZATION TO OBTAIN A CONSUMER CREDIT REPORT IN SECTION 15 CUSTOMER AUTHORIZES PAYMENT OF ALL AMOUNTS DUE TO COMPANY BY THE METHOD SPECIFIED ABOVE CUSTOMER ALSO ACKNOWLEDGES BEING ORALLY INFORMED OF CUSTOMER'S RIGHT TO CANCEL AT THE TIME OF EXECUTION OF THIS AGREEMENT

**RIGHT TO CANCEL:** YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. PLEASE SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

Authoritative Original Created 10/30/2014 11:36:53 PM -05:00
eContract v1.3 MFD Gen 3.18.14 EN-US

**Exhibit A**

Electronically Filed - St. Louis County - July 28, 2021 - 04:58 PM

THIS AGREEMENT SHALL NOT BE BINDING UPON COMPANY UNTIL COMPANY BEGINS MONITORING SERVICE

BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE READ AND AGREED TO ALL TERMS OF THIS AGREEMENT AND HAVE RECEIVED TWO COPIES OF THE NOTICE OF CANCELLATION.



Signed By: Arlie T (***)

Representative: lucas babinger State ID# Not Required

**FOR OFFICE USE ONLY**

| | Account Number | Date Installed | Next Billing Date | Other |
|---|---|---|---|---|
| ☐ Digital Monitoring | | 10-30-14 | 12-30-14 | |
| ☐ Two-Way Voice | | | | |

4. BILLING/LATE CHARGES/ FAILED PAYMENTS: In the event any Late Charges or Failed Payment Charges are held to be in excess of the highest lawful amount, such charges shall be reduced to the highest lawful amount, and any excess charges will be promptly refunded or credited to Customer's account. Auto-pay and credit card payment Customers will not receive a billing statement.

5. COMPANY IS NOT AN INSURER AND LIMITATION OF LIABILITY; CUSTOMER ACKNOWLEDGES AND AGREES THAT NEITHER COMPANY NOR ITS CONTRACTOR IS AN INSURER; THAT CUSTOMER ASSUMES ALL RISK OF PERSONAL INJURY AND LOSS OR DAMAGE TO CUSTOMER'S PREMISES OR TO THE CONTENTS THEREOF. Customer further acknowledges and agrees that if any insurance is desired Customer must obtain it in addition to the Company's other rights at law or under this Agreement, this Customer specifically releases the Company and its contractor from any liability for any event or condition covered by the Customer's insurance. CUSTOMER UNDERSTANDS AND AGREES THAT IF COMPANY OR ITS CONTRACTOR SHOULD BE FOUND LIABLE FOR LOSS OR DAMAGE DUE TO COMPANY'S OR ITS CONTRACTOR'S NEGLIGENCE, FAILURE TO PERFORM ANY OF THE OBLIGATIONS HEREIN, OR FAILURE OF THE MONITORING SERVICE OR THE EQUIPMENT IN ANY RESPECT WHATSOEVER, COMPANY'S AND ITS CONTRACTOR'S LIABILITY SHALL BE LIMITED TO THE SUM OF ONE THOUSAND DOLLARS ($1,000) AND THIS LIABILITY SHALL BE COMPANY'S OR ITS CONTRACTOR'S SOLE AND EXCLUSIVE LIABILITY. In addition, Customer understands and agrees any home automation or interactive services provided by Company or its Contractor are also subject to this $1,000 limit of liability, and Company shall not be responsible if such systems or services fail for any reason. If Customer wishes Company or its contractor to assume a greater liability, Customer may obtain from Company a higher limitation of liability by paying an additional periodic service charge to Company. If Customer elects to exercise this option, a rider shall be attached to this Agreement setting forth the terms, conditions and the amount of the liability and the additional periodic charge. Such rider and additional obligation shall in no way be interpreted to hold Company or its contractor as an insurer.

6. CUSTOMER'S DUTIES: Customer shall maintain the System in good operating condition. CUSTOMER IS RESPONSIBLE FOR TESTING THE SYSTEM MONTHLY AND ANYTIME THERE IS A CHANGE TO ANY ASPECT OF THE TRANSMISSION SYSTEM (SEE SECTION 9). Customer agrees to provide Company and its contractor with written notice of any changes, revisions and modifications to the Transmission System, and further agrees to provide and maintain current and correct subscriber and emergency contact information with Company and contractor. THE CUSTOMER MUST NOTIFY COMPANY OR ITS CONTRACTOR PROMPTLY IF CUSTOMER BELIEVES THERE IS A PROBLEM WITH THE TRANSMISSION SYSTEM. Local authorities may not respond to alarm notifications until all permits or licenses for use of the alarm system have been obtained. CUSTOMER'S DUTIES UNDER THIS SECTION ARE IMPORTANT TO ENSURE THAT THE TRANSMISSION SYSTEM FUNCTIONS PROPERLY. IF CUSTOMER FAILS TO PERFORM SUCH DUTIES, COMPANY AND ITS CONTRACTOR WILL NOT BE LIABLE FOR DAMAGES OR SUBJECT TO A PENALTY AS A RESULT.

7. FAMILIARIZATION PERIOD: CUSTOMER UNDERSTANDS THAT CUSTOMER'S PREMISES MAY BE LOCATED IN A JURISDICTION WHICH REQUIRES BY LAW A FAMILIARIZATION PERIOD FOR A CERTAIN NUMBER OF DAYS. CUSTOMER UNDERSTANDS THAT, DURING SUCH PERIOD, COMPANY HAS NO OBLIGATION TO NOTIFY ANY AUTHORITIES OF ANY INTRUSION ALARM SIGNAL. THE COMPANY RECEIVES FROM CUSTOMER'S PREMISES, EVEN IF DUE TO AN ACTUAL EMERGENCY EVENT.

8. DEFAULT, DISCONNECTION AND REMEDIES: Customer will be in default and breach of this agreement if Customer 1) fails to pay any fees or charges when due and such failure continues for ten (10) days after issuance of written notice by Company, 2) permanently or temporarily abandons the Customer's Premises, or 3) fails to perform other obligations set forth in this Agreement. In the event of a default, the Company may, by notice to Customer, terminate Customer's monitoring services. COMPANY'S RESPONSIBILITIES AND LIABILITIES UNDER THIS AGREEMENT SHALL ALSO IMMEDIATELY CEASE, AND COMPANY AND ITS CONTRACTOR WILL NOT BE RESPONSIBLE FOR ANY WARRANTIES OR SERVICES PROVIDED UNDER THIS AGREEMENT. Customer will remain responsible for all charges incurred prior to the effective date of the service termination. If Customer breaches this Agreement during its Initial Term or any Renewal Term, Customer acknowledges that it will cause substantial damage to Company, and because it would be difficult if not impossible to determine the amount of such damage, Customer will also pay as liquidated damages and not as a penalty either an amount equal to eighty (80%) percent of the remaining payments owed during the Initial or any Renewal Term or all sums the Company may be entitled to under state law and, in either case, any related levies, court costs, collection costs, and attorney fees. All amounts are due immediately without presentment, demand, protest or further notice, all of which Customer expressly waives.

9. TRANSMISSION SYSTEM: Customer's System communicates with the Company's monitoring facility utilizing one or more networks - telephone, cable, internet, cellular, or radio. It may also utilize equipment in Customer's home - telephone or cable equipment, modem, router, power supply. Together, the System, the network and other equipment represent the "Transmission System". The Transmission System is beyond the control of Company and Company takes no responsibility for its reliability or its continued compatibility with this intended usage. Each network and the related in-home equipment has its own inherent risks and reliability levels and the Customer should consider their own needs and requirements before choosing a Transmission System. IN ORDER FOR THE SYSTEM TO TRANSMIT SIGNALS OVER THE INTERNET, IT MUST HAVE UNINTERRUPTED ACCESS TO AN ALWAYS-ON HIGH-SPEED INTERNET CONNECTION. If a signal from Customer's System does not reach Company's monitoring facility for any reason, Company will not be able to respond. Communication issues might include, but are not limited to, network outages, severed lines, loss of power to key components, signal jamming, obsolescence or failure of components, and/or changes in laws or regulations. The Customer should test the System on a regular monthly basis and any time there is a change to any aspect of the Transmission System (See Section 6). The Customer should immediately notify the Company of any changes to the Transmission System (including use of DSL, VoIP or other broadband services as that may interfere with or prevent signal transmission) or any communication issues identified by Customer during testing. IF THE TRANSMISSION SYSTEM USES A TELEPHONE LINE AND THAT LINE IS DISCONNECTED, THE ALARM TRANSMISSION WILL FAIL. If Customer has chosen a means of communication that causes the System to lose control of a communication network in order to communicate with the monitoring facility, Customer understands that they will not be able to use that same communication network to call for emergency response during the time that the communication network is in use.

10. INTERRUPTION OF SERVICE: Neither Company nor its contractor assumes any liability for interruption of monitoring service due to strikes, riots, floods, storms, earthquakes, fires, power failures, interruption of unavailability of communication network service, acts of God or by any other cause beyond the control of Company or its contractor, or cause of such an event. Company may suspend the monitoring service and/or this Agreement without liability and without notification to Customer. Company or its contractor may suspend or cancel this Agreement without notice, liability, or penalty should the System, Customer's Premises or Company's or its contractor's monitoring facilities become so substantially damaged that further service is impractical. Customer will remain responsible to pay for services provided. Neither Company nor its contractor shall have any liability for delay in installation or maintenance of the equipment.

11. THIRD PARTY INDEMNIFICATION: Customer agrees to and shall indemnify, defend, and hold harmless Company and its officers, directors, employees, agents, contractors and any person or entity for whom the Company is legally responsible, from and against any and all claims arising from this Agreement brought by parties other than the parties to this Agreement.

12. SUBROGATION: Unless prohibited by Customer's insurance policy, Customer hereby discharges and agrees to hold Company harmless from any and all claims, liabilities, damages, losses or expenses, arising from or caused by any hazard covered by insurance in or on the Customer's Premises whether said loss is made by Customer, his agents, insurance carrier, or other parties claiming under or through Customer. Customer agrees to indemnify, defend and hold harmless Company and its contractor from any action for subrogation that may be brought against Company or its contractor by any insurer or insurance carrier, or its agents or assigns, including the payment of all damages, expenses, costs and attorney's fees. Customer shall notify their insurance carrier of the terms of this provision.

Authoritative Original Created: 10/30/2014 11:36:55 PM -05:00
eContract v1.3 MPD Gen 3 18 14 EN-US

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

**13. LIMITATION ON ACTIONS:** To the extent permitted by law both parties hereby agree that no suit or action that relates in any way to this Agreement (whether based upon contract, negligence or otherwise) shall be brought against the other party more than one (1) year after the accrual of the cause of action.

**14. BINDING ARBITRATION: THE PARTIES AGREE TO RESOLVE THROUGH BINDING ARBITRATION ALL CLAIMS, DISPUTES, OR LAWSUITS (COLLECTIVELY "CLAIMS"), REGARDLESS OF THEIR NATURE, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER BUSINESS RELATIONSHIP BETWEEN THE PARTIES.** The parties agree that arbitration shall be conducted in accordance with the commercial rules of the Federal Arbitration Act (FAA). Arbitration or any related litigation will take place in Dallas, Texas, unless both parties agree to a different location. The arbitration shall be conducted by an attorney who is knowledgeable about the security industry. The arbitrator is not authorized to grant punitive damages. Customer and Company agree that each may bring claims against the other only in Customer or Company's individual capacity, and not as a Plaintiff or class member in any purported class or representative proceeding. Further, unless both Customer and Company agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not preside over any form of a representative or class proceeding of which these claims will be a part. All direct and indirect costs for arbitration will be paid by the non-prevailing party or split in an equitable manner by the arbitrator. The arbitration proceedings, including decisions and awards, shall be held in confidence by both parties. The parties acknowledge that by executing this Agreement, they are waiving all rights to a jury or bench trial for all claims between the parties.

**15. FALSE ALARMS:** Customer understands that local authorities may impose fines for false alarms or signals, and Customer agrees to be responsible for those fines and any related costs whether they are levied directly on Customer or on the Company, its contractors, or subcontractors.

**16. EXTENDED SERVICE OPTION:** If Customer requests repair service (other than service pursuant to an original installation warranty), Company or its contractor may agree to provide such repair service during its regular business hours of 8:00 a.m. to 5:00 p.m. Monday through Friday (excluding holidays) for fifty dollars ($50) per service line (or at Company's customary rates outside of the specified hours or days) for as long as Company provides Customer's monitoring service and Customer is current on all payments. Customer is responsible for repairs to or replacements of batteries, key fobs, alarm screens, cellular equipment, cameras, video equipment, and home automation or interactive notification services, equipment, hardware or software. Customer is also responsible for damage caused by abuse, misuse, faulty connections, tampering, construction, vandalism, theft, acts of God, cosmetic damage or any other cause other than normal wear and tear.

**17. FIRE PREVENTION DEVICES.** Any fire or life safety device (including smoke detectors, carbon monoxide detectors or other auxiliary devices) must be installed and operated in strict accordance with manufacturer's and/or Company's specifications, tested at least monthly (see section 6) and used in conjunction only with UL certified devices. To the extent fire or life safety devices rely on other devices not connected to the System, Customer must ensure that all devices, whether connected to the System or not, are powered by an always-on power source or live battery. Customer agrees that if power is cut off, the battery is low or dead, or a fire event cuts off the electricity or results in a loss of power that the fire or life safety devices will not operate, the alarm will not sound and no signals will be transmitted to Company. Customer also must verify on a regular basis that all fire or life safety devices can properly transmit signals via the Transmission System (see Sections 5 and 6). Lastly, Customer agrees that the number and location of any fire or life safety devices can be governed by requirements or recommendations in national, state, and local laws, codes, and standards, and that any such fire or life safety devices may not fulfill such requirements or recommendations for number or location, and it is Customer's sole responsibility to comply with applicable laws, codes and standards relating to installation, placement, or maintenance of any such fire or life safety devices.

**18. ASSIGNMENT:** This Agreement may not be assigned in whole or in part by Customer. Company may assign or subcontract all or any portion of this Agreement without notice to Customer and any such assignee or subcontractor shall be bound to the rights, benefits, privileges and protection afforded to Company under the terms of this Agreement. This contract or note is for future services and puts all assignees on notice of the consumer's right to cancel under chapter 2.18, Florida Administrative Code.

**19. ACKNOWLEDGMENT:** In compliance with the Fair Credit Reporting Act (FCRA), Customer is authorizing Company now and at any time during the term of this Agreement to obtain a consumer credit report. Customer should refer to the FCRA for further explanations of Customer's rights.

**20. ELECTRONIC COMMUNICATION:** Customer hereby consents to receive communications, including, but not limited to, agreements, notices and invoices from Company electronically at the e-mail address provided herein. In order to access and retain electronic communications from the Company, Customer needs access to the internet, Adobe Reader (.pdf) software and a printer (the "Capabilities"). Customer hereby acknowledges that he/she/it has the Capabilities necessary to receive electronic communications from Company. Customer may, at any time, (a) request that this Alarm Monitoring Agreement be provided in writing, (b) update any contact information with the Company, and/or (c) withdraw consent to receive communications electronically from the Company, by sending notice electronically to econtracts@adtprotect.com or in writing to 60 Jefferson Park Rd, Warwick, RI 02888.

**21. ENTIRE AGREEMENT:** This Agreement is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof. Company's or its contractor's duty and obligation to provide monitoring service to Customer arise solely from this Agreement. This Agreement supersedes all prior representations, understandings, or agreements of the parties. This Agreement can only be modified (a) in writing, signed by the parties or their duly authorized agents or (b) by written notice sent by Company to Customer, provided that Customer does not object in writing within thirty (30) days after receiving the notice. No waiver or breach of any term or condition of this Agreement shall be construed to be a waiver of any succeeding breach. Customer and Company agree that this electronic contract is the exclusive original and that this electronic contract is a transferable record for all intents and purposes as that term is defined in the applicable electronic contracting statutes.

**22. PRIVACY:** Company will use commercially reasonable efforts to maintain the privacy of Customer's information. Customer understands that Company cannot guarantee privacy and agrees not to hold the Company liable for any claims, loss, damages, or costs that may result from loss of privacy. Customer consents to Company contacting him/her about new products and services. Customer consents to the recording of all communications between the Customer and the Company.

**23. LICENSING:** If you are an Alabama resident, complaints against the licensee may be directed to the Alabama Electronic Security Board of Licensure. 7956 Vaughn Rd., PMB 392, Montgomery, AL 36116. (334) 264-9388. In Arkansas, licensing is regulated by the Arkansas Board of Private Investigators and Private Security Agencies, #1 State Police Plaza Drive, Little Rock, AR 72209, (501) 618-8600. In California, alarm company operators are licensed and regulated by the Bureau of Security and Investigative Services, Department of Consumer Affairs, P.O. Box 942001, Sacramento, CA 94258 (916) 574-7950. In Florida, licensing is regulated by the Florida Department of Business and Professional Regulation. Complaints may be directed to the Department of Business and Professional Regulation, Division of Regulation / Compliance - Consumer Services, 1940 N. Monroe St., Tallahassee, FL 32399. In New York, complaints may be directed to NYS Department of State, Division of Licensing Services. Complaint Review Office, 123 William Street, 19th Floor, New York, NY 10038, (212) 417-5790. In North Carolina, licensing is regulated by the North Carolina Alarm Systems Licensing Board. 4901 Glenwood Avenue, Suite 200, Raleigh, NC 27612  (919) 788-5320. In Texas, licensing is regulated by the Texas Department of Public Safety, Commission on Private Security Bureau, P.O. Box 4087, Austin, TX 78773, (512) 424-7710.

Authoritative Original Created 10/10/2014 11:36:55 PM -05:00
eContract v1.3 MPD Gen 3 18:14 EN-US

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

# NOTICE OF CANCELLATION

**DEALER:** Alliance Security, Inc.    **CUSTOMER NAME:** Arlie Tucker    **DATE OF TRANSACTION:** 10/30/2014 11:36:55 PM
**PREMISES ADDRESS:** ███████████, St. Clair, MO, 63077

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE TO:
Alliance Security, Inc. AT 60 Jefferson Park Rd. Warwick, RI 02888 NOT LATER THAN MIDNIGHT OF 11/4/2014.

☐ I Hereby Cancel This Transaction

**BUYER'S SIGNATURE:** _____    **DATE:** _____

Authoritative Original Created 10/30/2014 11:36:55 PM -05:00
eContract v1.3 MPD Gen 3.18 14 EN-US

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

**21SL-CC03384**

## NOTICE OF CANCELLATION

DEALER: Alliance Security, Inc.    CUSTOMER NAME: Arlie Tucker    DATE OF TRANSACTION: 10/30/2014 11:36:55 PM
PREMISES ADDRESS: ▓▓▓▓▓▓▓▓ St. Clair, MO, 63077

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE TO:
Alliance Security, Inc. AT 60 Jefferson Park Rd. Warwick, RI 02888 NOT LATER THAN MIDNIGHT OF 11/4/2014.

☐ I Hereby Cancel This Transaction

BUYER'S SIGNATURE: _____    DATE: _____

Authoritative Original Created: 10/30/2014 11:36.55 PM -05:00
eContract v1.3 NPD Geo.3 18.14 EN-US

**Exhibit A**

Electronically Filed - St. Louis County - July 28, 2021 - 04:58 PM

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM



**Alliance Security, Inc.**
60 Jefferson Park Rd
Warwick, RI 02888
(866) 493-1253
econtracts@ahprotect.com
License (AL)13-1545,(AZ)Not A Licensed Contractor,(AZ)BTR 18520 (CA)ACO-7757 (CT)ELC 0180118-E1,(FL)EF20000848 (GA)LVU406003,(IL)127 001563,(MA)9699A,(MD)
107-1602 (NC)1958-CSA (NC)2718S-SP-FA/LV,(NJ)34BX00014800,(NV)0078299 (NY)12000312280,(OH)53 89 1723 (OK)10147S,(PA)PA049097,(RI)1307,(SC)BAC 13513,(SC)
FAC 13513 (TN)11-5,(TX)ACR-1770643 (TX)B15750.

## Installation Agreement

1. This Installation Agreement (the "Agreement") is made as of 10/30/2014 by and between Alliance Security, Inc., the "Company" and the "Customer" listed below who owns the residence or business located at the address shown below (the "Premises")

| Tucker, Arlie | | Premise Telephone: | | | Effective Date 10/30/2014 |
|---|---|---|---|---|---|
| | | | | | Subscriber Password: 1Pack |
| St. Clair | MO | 63077 | County: Franklin | | Email: |
| EContractID: 1500567 | | | | | |

| Subscriber Contact List | Telephone Number | Ext | Type | User # | Passcode |
|---|---|---|---|---|---|
| Sue Tucker | | | Home | | |

2. PURCHASE OF THE SYSTEM. Customer hereby agrees to buy, and Company hereby agrees to sell, at the Premises the Alarm system described below and incorporated herein for all purposes by this reference (the "System"), in accordance with the terms and conditions hereinafter set forth

**Installation & Equipment Sales**

| Item/Equipment | | | Pris | Qty | Price | Total |
|---|---|---|---|---|---|---|
| Basic System | | | | 20 | $0.00 | $0.00 |
| | | | | | Subtotal: | $0.00 |
| | | | | | Other: | $0.00 |
| | | | | | Permits: | $0.00 |
| | | | | | Tax: | $0.00 |
| | | | | | TOTAL: | $0.00 |

## Customer Authorization

| | | Yes | Customer acknowledges that the Company has authorization to deduct the Total Payment Due from the Account listed below: |
|---|---|---|---|
| 1. Are you the homeowner? | | Yes | |
| 2. Is your home new construction? | | Yes | |
| 3. Are you under any contract/obligation with any other company for monitoring services? | | Yes | Monitoring | Activation Fee | Equipment | Total Payment Due |
| | | | $59.99 | $0.00 | $0.00 | $59.99 |
| 4. I understand that Alliance Security, Inc. or any representative of Alliance Security, Inc., cannot be responsible for canceling any services with my current security company (if Applicable) | | Yes | Check Routing Number: - |
| 5. I understand that I have signed an agreement to receive monitoring for 36 months | | Yes | Credit Card | Type: Visa | Exp. |
| | | | Credit Card # | | |
| | | | Billing Address | | |
| | | | St. Clair, MO 63077 | | |

CUSTOMER AUTHORIZES PAYMENT BY THE METHOD SPECIFIED ABOVE

RIGHT TO CANCEL: YOU, THE CUSTOMER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY FROM THE DATE OF THIS TRANSACTION (CONSUMER TRANSACTION ONLY). PLEASE REVIEW THE NOTICE OF CANCELLATION PROVIDED TO YOU BY THE SALESPERSON FOR AN EXPLANATION OF YOUR RIGHTS TO CANCEL THIS AGREEMENT.
PLEASE REVIEW THE NOTICE OF CANCELLATION PROVIDED TO YOU BY THE SALESPERSON FOR AN EXPLANATION OF YOUR RIGHTS TO CANCEL THIS AGREEMENT.
BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE READ AND AGREED TO ALL TERMS OF THIS AGREEMENT AND HAVE RECEIVED TWO COPIES OF THE NOTICE OF CANCELLATION THIS AGREEMENT SHALL NOT BE BINDING UPON COMPANY UNTIL COMPANY BEGINS INSTALLATION OF THE SYSTEM.

Signed By: Arlie Tucker

Representative: lucas ballinger State ID#: Not Required

3. INSTALLATION OF THE SYSTEM. Company agrees to install or cause to be installed the System at the Premises in a workmanlike manner and in compliance with applicable laws, regulations and industry standards, and to furnish all material and labor necessary for such installation subject to the following conditions. (a) Customer authorizes and empowers the Company to enter upon the Premises for such purpose and agrees to make the Premises available for such purpose during normal working hours (consisting of 8:00 a.m. - 5:00 p.m. Monday through Friday, excluding national holidays), (b) Customer will provide required electrical power outlets at the location or locations designated by Company for equipment requiring such power. (c) Customer will provide any communication network to which the system may be connected, including any internet, intranet, cable, transmission or telephone lines and service (Company recommends that Customer properly install a RJ31X jack for connection of the System to Customer's telephone service). (d) Customer understands that installation will require drilling and cutting into certain parts of the Premises, which shall be identified to Customer before the work commences, and that certain wiring may be required to be exposed, although Company will attempt to conceal wiring in the furnished areas of the Premises whenever possible, and Customer agrees to provide for lifting and replacing carpeting, if required, for installation of floor mats, switches, or wiring, and (e) Company expressly assumes no liability for delay in installation of the System due to strikes, riots, floods, storms, earthquakes, fires, power failures, insurrection, acts of God, shortages of labor or materials, or any other cause beyond the control of Company. CUSTOMER UNDERSTANDS THAT THE CITY OR COUNTY IN WHICH CUSTOMER'S PREMISES ARE LOCATED MAY REQUIRE THAT CUSTOMER OBTAIN A PERMIT FOR THE INSTALLATION, USE AND MONITORING OF AN ALARM SYSTEM, AND CUSTOMER WILL OBTAIN SUCH PERMIT(S), IF NEEDED. Upon completion of the installation of the alarm system Company shall thoroughly instruct Customer in the proper use of the alarm system

4. NOT A MONITORING AGREEMENT. Customer hereby acknowledges and agrees that this Agreement is not a monitoring contract and does not provide for monitoring services to be provided by Company or any other party with respect to the System. Monitoring services to be provided to Customer with respect to the System shall be pursuant to a separate agreement to be separately negotiated by the parties, if desired.

Authoritative Original Created: 10/30/2014 11:36:55 PM -05:00
eContract i 3 NPD Gen 3 18 14 EN-US

**Exhibit A**

Electronically Filed - St. Louis County - July 28, 2021 - 04:58 PM

**5. TITLE TO THE SYSTEM; RISK OF LOSS.** Customer agrees to pay Company for the System, any related equipment and the installation of same, prior to completion of installation of the System. Customer agrees that title to and ownership of the System, all component parts, and any related equipment shall remain the sole and exclusive property of Company until Customer has paid in full, and Customer shall bear the entire risk of loss to the System until that time. If Customer fails to pay the amount specified in this Agreement, then Customer authorizes Company to enter into the Premises and remove the System, which shall not be deemed to be a waiver of Company's right to damages, and Company shall continue to have the right to enforce any legal remedy or right available to Company. Further, Company shall in no way be obligated to restore the Premises to its original condition or repair same in the event the System is removed as a result of Customer's default.

**6. LIMITED ONE YEAR WARRANTY.** As Company warrants that the System will be free from defects in material and workmanship under normal use and operating conditions for a period of one year from the date of installation. Company will repair or replace, at Company's sole option, any component of the System proven to be defective during such period without further charge to Customer. (b) Warranty Service will be furnished during Company's regular business hours of Monday - Friday, (excluding holidays), from 8:00 a.m. until 5:00 p.m., subject to any applicable trip charges or after 90 days from the date of installation. Emergency Service provided at other times shall be paid by Customer at Company's customary rate. Customer must provide full access to the Premises and to the System requiring repair at the time agreed upon by Company and Customer. (c) Warranty Service excludes batteries, key fobs, alarm screens, cellular equipment, cameras, video equipment, and home automation or interactive notification servers equipment, hardware or software. Customer is also responsible for damage caused by abuse, misuse, faulty connections, tampering, construction, vandalism, theft, acts of God, cosmetic damage or any other cause other than normal wear and tear. Company reserves the right to use new or reconditioned parts in fulfillment of this warranty, and retain any parts removed from the System. Parts repaired with were not defective shall be at additional cost to Customer. Company shall not be responsible for failure to render service due to causes beyond Company's control: a) Company shall not be required to make repairs or replace any parts of the System that has been abused or not operated in accordance with instructions provided to Customer. Any other service provided shall be paid by Customer at Company's prevailing material and hourly rates.

**7 DISCLAIMER OF ALL OTHER WARRANTIES. COMPANY DOES NOT REPRESENT OR WARRANT THAT THE SYSTEM OR ANY MONITORING SERVICE WILL PREVENT ANY LOSS BY BURGLARY, FIRE, HOLDUP OR OTHERWISE, OR THAT THE SYSTEM OR ANY MONITORING SERVICE WILL IN ALL CASES PROVIDE THE NOTIFICATION SERVICE FOR WHICH IT IS INTENDED.** Customer acknowledges and agrees that Company has made no representations of warranties, express or implied, as to any matter whatsoever, including without limitation the condition of the system or any monitoring service, their merchantability or their fitness for any particular purpose nor has Customer relied on any representations or warranties, express or implied, other than those expressly contained herein. Customer further acknowledges and agrees that any affirmation of fact or promise shall not be deemed to create an express warranty, that client is not relying on company's skill or judgment in selecting or furnishing a system, and that there are no warranties which extend beyond the face of the agreement hereof. CUSTOMER FURTHER ACKNOWLEDGES AND AGREES THAT COMPANY IS NOT AN INSURER THAT CUSTOMER ASSUMES ALL RISK OF PERSONAL INJURY AND LOSS OR DAMAGE TO CUSTOMER'S PREMISES OR TO THE CONTENTS THEREOF, AND THAT CUSTOMER HAS READ AND UNDERSTANDS ALL OF THIS AGREEMENT, PARTICULARLY PARAGRAPHS 9, 10 AND 11 WHICH SET FORTH COMPANY'S MAXIMUM LIABILITY IN THE EVENT OF ANY LOSS OR DAMAGE TO CUSTOMER OR ANYONE ELSE. TO THE EXTENT NOT DISCLAIMED, ALL IMPLIED WARRANTIES ARE LIMITED IN DURATION TO THE MAXIMUM EXTENT ALLOWED BY THE APPLICABLE STATE LAW. SOME STATES DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF CONSEQUENTIAL OR INCIDENTAL DAMAGES, OR A LIMITATION ON THE DURATION OF IMPLIED WARRANTIES, SO THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THE WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH MAY VARY FROM STATE TO STATE

**8. ACCEPTANCE OF INSTALLATION.** Customer hereby acknowledges and agrees that any error or omission in the installation of the System must be brought to the attention of Company in writing within five (5) days after completion of installation, otherwise, the installation shall be deemed accepted by and satisfactory to Customer.

**9. COMPANY IS NOT AN INSURER AND LIMITATION OF LIABILITY.** CUSTOMER ACKNOWLEDGES AND AGREES THAT NEITHER COMPANY NOR ITS CONTRACTOR IS AN INSURER, THAT CUSTOMER ASSUMES ALL RISK OF PERSONAL INJURY AND LOSS OR DAMAGE TO CUSTOMER'S PREMISES OR TO THE CONTENTS THEREOF. Customer further acknowledges and agrees that if any insurance is desired, Customer must obtain it. In addition to the Company's other rights at law or under this Agreement, the Customer specifically releases the Company and its contractor from any liability for any event or condition covered by the Customer's insurance. CUSTOMER UNDERSTANDS AND AGREES THAT IF COMPANY OR ITS CONTRACTOR SHOULD BE FOUND LIABLE FOR LOSS OR DAMAGE DUE TO COMPANY'S OR ITS CONTRACTOR'S NEGLIGENCE, FAILURE TO PERFORM ANY OF THE OBLIGATIONS HEREIN, OR FAILURE OF THE MONITORING SERVICE OR THE EQUIPMENT IN ANY RESPECT WHATSOEVER, COMPANY'S AND ITS CONTRACTOR'S LIABILITY SHALL BE LIMITED TO THE SUM OF ONE THOUSAND DOLLARS ($1,000) AND THIS LIABILITY SHALL BE COMPANY'S OR ITS CONTRACTOR'S SOLE AND EXCLUSIVE LIABILITY. In addition, Customer understands and agrees that the installation of any home automation or interactive services provided by third parties are also subject to this $1,000 limit of liability, and Company shall not be responsible if such systems or services fail for any reason. If Customer wishes Company or its contractor to assume a greater liability, Customer may obtain from Company a higher limitation of liability by paying an additional periodic service charge to Company. If Customer elects to exercise this option, a rider shall be attached to this Agreement setting forth the terms, conditions and the amount of the liability and the additional periodic charge. Such rider and additional obligation shall in no way be interpreted to hold Company or its contractor as an insurer.

**10. THIRD PARTY INDEMNIFICATION.** Customer agrees to and shall indemnify, defend, and hold harmless Company and its officers, directors, employees, agents, contractors and any person or entity for whom the Company is legally responsible, from and against any and all claims arising from this Agreement brought by parties other than the parties to this Agreement.

**11. SUBROGATION.** Unless prohibited by Customer's insurance policy, Customer hereby discharges and agrees to hold Company harmless from any and all claims liabilities, damages, losses or expenses, arising from or caused by any hazard covered by insurance in or on the Customer's Premises whether said claims are made by Customer, his agents, insurance carrier, or other person claiming under or through Customer. Customer agrees to indemnify, defend and hold harmless Company and its contractor from any demand for subrogation that may be brought against Company or its contractor by any insurer or insurance carrier, or its agents or assigns, including the payment of all damages, expenses, costs and attorney's fees. Customer shall notify their insurance carrier of the terms of this provision.

**12. LIMITATION OF ACTIONS.** Both parties hereby agree that no suit or action that relates in any way to this Agreement (whether based upon contract, negligence or otherwise) shall be brought against the other more than one (1) year after the accrual of the cause of action therefrom.

**13. BINDING ARBITRATION.** THE PARTIES AGREE TO RESOLVE THROUGH BINDING ARBITRATION ALL CLAIMS, DISPUTES, OR LAWSUITS (COLLECTIVELY CLAIMS), REGARDLESS OF THEIR NATURE, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER BUSINESS RELATIONSHIP BETWEEN THE PARTIES. The parties agree that arbitration shall be conducted in accordance with the commercial rules of the Federal Arbitration Act (FAA). Arbitration or any related litigation will take place in Dallas, Texas, unless both parties agree to a different location. The arbitration shall be conducted by an attorney with a knowledge about the security industry. The arbitrator is not authorized to grant punitive damages. Customer and Company agree that each may bring claims against the other only in Customer or Company's individual capacity, and not as a Plaintiff or class member in any purported class or representative proceeding. Further, unless both Customer and Company agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not preside over any form of a representative or class proceeding of which these claims will be a part. All direct and indirect costs for arbitration will be paid by the non-prevailing party or split in an equitable manner by the arbitrator. The arbitration proceedings, including decisions and awards, shall be held in confidence by both parties. The parties acknowledge that by executing this Agreement, they are waiving all rights to a jury or bench trial for all claims between the parties.

**14. CHANGES IN STANDARDS AND REGULATIONS OF REGULATORY AGENCIES.** Company shall not be responsible nor liable for any costs or changes necessitated by changes in the regulations and standards of any and all regulatory agencies after the date of execution of this Agreement. Customer shall be responsible for and shall pay to Company the cost of any additions, corrections or changes to the System that may be requested or required, after the execution of this Agreement by Customer by any of the regulatory agencies or institutions, including, but not limited to any State Fire Marshall, any insurance companies, the National Fire Protection Association, Underwriters Laboratories, Inc., or any other municipal or local police, fire or electrical agencies.

**15. TESTING** It is the responsibility of Customer to test the System for proper operation periodically, but not less than monthly.

**16. INVALID PROVISIONS.** If any of the terms or provisions of this Agreement shall be determined to be invalid or inoperative, all of the remaining terms and provisions shall remain in full force and effect.

**17. DEFAULT.** In the event of default by Customer in the performance of any of the terms or conditions of this Agreement, including timely payment of the amount due to Company upon completion of installation of the System, Company may pursue any one or more of the following remedies, which shall be cumulative and non-exclusive: (a) recover from Customer the total unpaid balance of the sum provided for in Paragraph 2 and any other sum provided for herein; (b) reposition the System; (c) immediately cease further work on the installation of the System; (d) terminate this Agreement by giving ten (10) days written notice to Customer; and (e) pursue any other remedy at law now or hereafter existing. In the event of a repossession of the System and resale thereof, Customer shall be responsible to Company for any deficiency remaining after Company applies the proceeds of such resale, first to all costs of repossession and resale, including, but not limited to, storage, repair, renovation, alteration, attorneys' fees, collection costs and commissions, and then to the unpaid amount due hereunder.

**18. COMPLIANCE WITH LAWS.** Customer agrees to use the System strictly in compliance with all applicable laws and regulations. Company assumes no responsibility for any unlawful activity on Customer's part. Should Customer's unlawful activity subject Company to any civil or criminal liability for any reason, Customer agrees to indemnify, defend and hold harmless Company from any such potential or actual liability, including payment of all attorneys fees and court costs related to such matters.

**19. ENTIRE AGREEMENT.** This Agreement is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof This Agreement supersedes all prior representations, understandings or agreements of the parties and the parties rely only upon the contents of this Agreement in executing it This Agreement can only be modified by a writing signed by the parties or their duly authorized agent. No waiver or breach of any term or condition of this Agreement shall be construed to be a waiver of any succeeding breach. Customer agrees that Company may convert this Agreement to electronic media, which may serve as the evidence original

Authorative Original Created 10/30/2014 11:36:55 PM -05:00
eContract v 1 3 MPD Gen 3 18.14 EN-US

**Exhibit A**

20. LICENSING. If you are an Alabama resident, complaints against the licensee may be directed to the Alabama Electronic Security Board of Licensure, 7956 Vaughn Rd., PMB 392, Montgomery, AL 35116. (334) 264-9388. In Arkansas, licensing is regulated by the Arkansas Board of Private Investigators and Private Security Agencies, #1 State Police Plaza Drive, Little Rock, AR 72209. (501) 618-8600. In California, alarm company operators are licensed and regulated by the Bureau of Security and Investigative Services, Department of Consumer Affairs, P.O. Box 942507 Sacramento, CA 94258 (916) 574-7950. In Florida, licensing is regulated by the Florida Department of Business and Professional Regulation. Complaints may be directed to the Department of Business and Professional Regulation, Division of Regulation / Compliance - Consumer Services, 1940 N. Monroe St., Tallahassee, FL 32399. In New York, complaints may be directed to NYS Department of State, Division of Licensing Services. Complaint Review Office, 123 William Street, 19th Floor, New York, NY 10038. (212) 417-5790. In North Carolina, licensing is regulated by the North Carolina Alarm Systems Licensing Board, 4901 Glenwood Avenue, Suite 200, Raleigh, NC 27612, (919) 789-5320. In Texas, licensing is regulated by the Texas Department of Public Safety, Commission on Private Security Bureau, P.O. Box 4087, Austin, TX 78773, (512) 424-7710.

21. ELECTRONIC COMMUNICATION: Customer hereby consents to receive communications, including, but not limited to, agreements, notices and invoices from Company electronically at the e-mail address provided herein. In order to access and retain electronic communications from the Company, Customer needs access to the internet, Adobe Reader (.pdf) software and a printer (the "Capabilities".) Customer hereby acknowledges that he/she/it has the Capabilities necessary to receive electronic communications from Company. Customer may, at any time, (a) request that the Installation Agreement be provided in writing, (b) update any contact information with the Company, and/or (c) withdraw consent to receive communications electronically from the Company, by sending notice electronically to ucontracts@abprotect.com or in writing to, 63 Jefferson Park Rd. Warwick, RI 02888.

Authoritative Original Created 10/10/2014 11:36:55 PM -05:00
eContract v1.3 M/O Gen 3 18-14 EN-US

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

## NOTICE OF CANCELLATION

DEALER: Alliance Security, Inc.    CUSTOMER NAME: Arlie Tucker    DATE OF TRANSACTION: 10/30/2014 11:36:55 PM
PREMISES ADDRESS: ███████████ St. Clair, MO, 63077

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL, TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE TO:
Alliance Security, Inc. AT 60 Jefferson Park Rd. Warwick, RI 02888 NOT LATER THAN MIDNIGHT OF 11/4/2014.

☐ I Hereby Cancel This Transaction

BUYER'S SIGNATURE: _____    DATE: _____

Authoritative Original Created  10/30/2014 11:36:55 PM -05:00
eContract v1.3 MPD Gen 3 18-14 EN-US

**Exhibit A**

Electronically Filed - St Louis County - July 28, 2021 - 04:58 PM

# NOTICE OF CANCELLATION

DEALER. Alliance Security, Inc.    CUSTOMER NAME: Arlie Tucker    DATE OF TRANSACTION: 10/30/2014 11:36:55 PM
PREMISES ADDRESS▒▒▒▒▒▒▒ St. Clair, MO, 63077

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE TO:
Alliance Security, Inc. AT 60 Jefferson Park Rd. Warwick, RI 02888 NOT LATER THAN MIDNIGHT OF 11/4/2014.

☐ I Hereby Cancel This Transaction

BUYER'S SIGNATURE: _____    DATE: _____

Authoritative Original Created 10/30/2014 11:36:55 PM -05:00
eContract v1.3.MPD Gen 3 18 14 EN-US

**Exhibit A**